2022 IL App (1st) 172390-B

No. 1-17-2390

Opinion filed March 10, 2022

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 92 CR 27511 |
| | ) | |
| JUAN FIGUEROA, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justice Burke concurred in the judgment and opinion.
Presiding Justice Gordon specially concurred, with opinion.

**OPINION**

¶ 1    Defendant, Juan Figueroa, appeals an order of the circuit court denying him leave to file a successive postconviction petition challenging the 75-year sentence he received for a murder he committed at the age of 17. He contends that the sentence is a *de facto* life sentence that is unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012), because it was imposed without adequate consideration of his youth and its attendant characteristics. The State counters that defendant's sentence is not a *de facto* life sentence because he is eligible to receive day-for-day good-conduct credit that may entitle him to release after 37.5 years. Alternatively, the State argues

that defendant's sentence comports with *Miller* because the trial court considered his youth and its attendant characteristics before imposing the sentence.

¶ 2    On August 6, 2020, this Court issued a published opinion reversing the circuit court's order, vacating defendant's sentence, and remanding for a new sentencing hearing. This case now returns to this court following the Illinois Supreme Court's supervisory order directing us to reconsider our decision in light of *People v. Dorsey*, 2021 IL 123010. For the reasons set out below, we affirm the circuit court's denial of defendant's motion for leave to file a successive petition.[1]

¶ 3                                    I. BACKGROUND

¶ 4    In July 1992, at the age of 17, defendant participated with his father and another man in the armed robbery and murder of Aldemar Perez. At trial, the State relied primarily on defendant's custodial statements. In the statements, defendant explained that he overheard his father and a man named Daniel Aponte discussing a plan to steal drugs and money from the victim. Defendant asked his father to include him in the plan because he needed money. The plan called for defendant, his father, and a man named Francisco Perez to lure the victim to Francisco's garage under the guise of buying his van. Once there, they would rob the victim and take the keys to his apartment.

¶ 5    On the day in question, defendant, his father, and Francisco drove to the victim's place of business, and defendant's father and Francisco went inside. A short time later, defendant's father and Francisco emerged with the victim, and the three men and defendant got into the victim's van. Francisco drove the van to his garage, where he told the victim that he had air compressors that he

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

wanted to sell him. Defendant's father and Francisco entered the garage with the victim, while defendant waited outside.

¶ 6    As he stood outside, defendant heard the sound of someone being hit and a scream coming from inside the garage. Defendant then entered the garage and saw the victim lying face down on the floor, with defendant's father and Francisco kneeling over him. Defendant's father had a hammer in his hand, and the victim had blood on his head and face. Defendant saw the victim struggling, so he held down the victim's legs. Francisco then took the hammer from defendant's father and used it to hit the victim on the head about 20 times. When the victim continued to struggle, defendant hit him twice on the legs and back with a two-by-four piece of wood. Defendant then tied the victim's hands and feet with electrical cord. With the victim still struggling, defendant hit him with a tire iron. (The detective who took defendant's initial oral statement testified that defendant stated that he hit the victim in the head with the tire iron. In a statement memorialized in writing by an assistant state's attorney, defendant stated that he hit the victim in the back and stomach.) Francisco then wrapped the victim's mouth with tape.

¶ 7    Defendant's father took the victim's apartment keys, and defendant took the victim's wallet. Defendant's father then told defendant to leave the garage and wait outside. Several minutes later, defendant's father and Francisco exited the garage, and the trio drove to Aponte's house, where they cleaned up and discarded their blood-soaked clothing. The next day, defendant, his father, and Aponte went to the victim's apartment and stole jewelry, cocaine, and $50,000 in cash. Aponte gave defendant $500 and some of the cocaine. While at the apartment, defendant heard his father and Aponte discussing how to dispose of the victim's body. Police later found the victim's body in an alley, wrapped in a tarp, with his eyes, nose, and mouth covered with tape and his arms

and legs tied together behind his back. The medical examiner testified that the victim suffered injuries to his body consistent with blunt force trauma and that he died of suffocation, with strangulation as a contributing factor.

¶ 8    The jury found defendant guilty of first degree murder and armed robbery. The sentencing range for first degree murder was 20 to 60 years in prison. See 730 ILCS 5/5-8-1(a)(1) (West 1992). However, the trial court could impose an extended-term sentence of up to 100 years in prison, or a sentence of natural life imprisonment, if it found that the offense "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." 730 ILCS 5/5-5-3.2(b)(2), 5-8-1(a)(1)(b), 5-8-2(a)(1) (West 1992). The trial court could also impose a natural life sentence if it found one of several other aggravating factors, including that "the defendant committed the murder pursuant to a contract, agreement or understanding by which he was to receive money or anything of value in return for committing the murder" or that "the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." 730 ILCS 5/5-8-1(a)(1)(b), 9-1(b)(5), (11) (West 1992).[2]

¶ 9    At the sentencing hearing, the trial court considered a presentence investigation report (PSI) prepared by the probation department. The PSI noted that defendant was born in Puerto Rico and moved to Chicago at the age of one. His parents had been married for 25 years, and he had one older sister. He described his childhood as good and stated that he had a close relationship

---

[2] Because defendant was under the age of 18 at the time of the offense, he was ineligible for a sentence of death. See 720 ILCS 5/9-1(b) (West 1992).

with his parents and sister. He denied being abused or neglected, but he stated that he was left blind in one eye after being hit with a tile at the age of four. He admitted to being a member of the Latin Disciples street gang and stated that he joined the gang at the age of 11. He dropped out of school after the tenth grade, but prior to dropping out, he had been a member of the swim team and received average grades. He reported having worked as a grocery store bagger between the ages of 9 and 11 and in construction with his father from the age of 11 until his arrest in this case.

¶ 10     The PSI also documented defendant's history of juvenile delinquency adjudications and adult criminal convictions. In February 1991, he was adjudicated delinquent for committing a robbery and was sentenced to probation. The probation was terminated "without designation" in September 1991, when defendant was adjudicated delinquent for committing a burglary. He was sentenced to a new term of probation for that offense, which was terminated unsatisfactorily in April 1992. In February 1992, defendant was convicted of burglary and was sentenced to 18 months of probation. In March 1992, he was convicted of committing another burglary and was sentenced to a concurrent two-year term of probation.

¶ 11     Defendant's sister and cousin testified at the sentencing hearing. Defendant's sister testified that she and defendant had a close relationship. She testified that defendant had never acted violently toward her and that she had never seen him act violently toward others. Defendant's cousin testified that she used to live with defendant's family and that she too had a good relationship with defendant. She also testified that defendant had never acted violently toward her and that she had never seen him act violently toward others.

¶ 12     Defense counsel asked the court to impose a sentence near the lower end of the sentencing range, suggesting a term between 20 and 30 years in prison. Counsel urged the court to consider

defendant's "young age," arguing that defendant was "impressionable" and had been negatively influenced by his father. Counsel described defendant's involvement in the robbery and murder as "minimal" and stressed that defendant did not plan the crimes but instead "went along" with his father, who was "supposed to be teaching him right from wrong." Counsel noted that defendant had not previously been convicted of any crime of violence and that he had a consistent work history and some education. Counsel urged the court not to "send[ ] [defendant] away forever," arguing that defendant was "salvageable" and could become "a productive member of society."

¶ 13    The prosecutor asked the court to impose a natural life sentence. She stressed the brutal and heinous nature of the crime and the victim's "slow torturous death." She also argued that the murder had been committed in a cold, calculated, and premeditated manner and that defendant had been motivated "solely by greed." She also noted that defendant was on probation for two prior burglary convictions at the time of the offense. Finally, she argued that defendant had not been "led into this crime unwittingly by [his] father" but had instead "volunteered his actions" and "was in from the planning stage."

¶ 14    After indicating that it had considered the PSI and the aggravating and mitigating factors discussed by the parties, the trial court imposed an extended-term sentence of 75 years in prison. The court determined that defendant was eligible for either a natural life sentence or an extended-term sentence because his actions during the course of the murder were "brutal and heinous" and because he committed the murder for personal gain. The court also noted that, while defendant's prior adult convictions did not involve crimes of violence, they constituted "serious offenses." The court then explained why a 75-year sentence was "the only just sentence in this case":

"The facts as I listened to the evidence that was put forth by the State during the course of trial show a person who has no or who puts no value on human life whatsoever, a person who is ruthless, cold, calculated[,] and *** savage. To be involved in and participate in acts such as this [is] unconscionable and beyond comprehension. It is one of the worse if not worst factual situations I have seen in my nine years in this building and in my 18 or so years involved in the criminal justice system. But for his age, [defendant] would be receiving a sentence of natural life imprisonment."

¶ 15   On direct appeal, defendant argued that the trial court erred in allowing the State to introduce evidence that his father had implicated him in an out-of-court statement. We concluded that any error was harmless given defendant's own confession and affirmed his conviction. See *People v. Figueroa*, 286 Ill. App. 3d. 1117 (1997) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 16   Defendant filed his first postconviction petition in 1997, alleging that his trial counsel was ineffective for refusing to allow him to testify and failing to inform him of his right to do so. The circuit court dismissed the petition as frivolous and patently without merit, and we affirmed that decision on appeal. See *People v. Figueroa*, 326 Ill. App. 3d. 1151 (2001) (table) (unpublished order under Illinois Supreme Court Rule 23). In 2010, defendant sought leave to file a second postconviction petition, alleging that his confession had been coerced and that he was actually innocent. The circuit court denied defendant leave to file the petition, concluding that his claims were barred by *res judicata*. On appeal, we granted a motion to withdraw filed by defendant's

appellate counsel and affirmed the circuit court's decision. See *People v. Figueroa*, No. 1-10-3135 (2011) (unpublished summary order under Illinois Supreme Court Rule 23).

¶ 17    In 2017, defendant again sought leave to file a successive postconviction petition, arguing that he was entitled to resentencing in light of "the latest scientific evidence on adolescent [brain] development."[3] Quoting *Roper v. Simmons*, 543 U.S. 551 (2005), which held that the death penalty is unconstitutional for juvenile offenders, defendant noted the United States Supreme Court's recognition that it "is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 573. Defendant argued that his sentence should likewise "reflect [the] latest scientific evidence on adolescent and young adult development, recognizing that youth who were under the age of 18 at the time of their crime have an especially strong ability to grow and change." The circuit court denied defendant leave to file a successive postconviction petition. The court explained that defendant was not entitled to resentencing because, with available day-for-day good-conduct credit, he may be eligible for release at the age of 55. Defendant filed a timely notice of appeal.

¶ 18                                    II. ANALYSIS

¶ 19    Defendant argues that the circuit court erred in denying him leave to file a successive postconviction petition challenging his sentence. He contends that his 75-year sentence for a murder he committed as a juvenile is unconstitutional under *Miller* because the trial court did not adequately consider his youth and its attendant characteristics before imposing the sentence. He

---

[3] Although defendant called his pleading a "motion for resentencing," the circuit court construed it as a motion for leave to file a successive postconviction petition. Neither side argues that the circuit court erred in doing so.

also alleges that his sentence is unconstitutional under the proportionate penalties clause of the Illinois Constitution. Ill. Const. 1970, art. I, § 11. We reject both claims.

¶ 20                    A. Principles Governing Successive Post-Conviction Petitions

¶ 21    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a procedural mechanism through which a defendant may assert a substantial denial of his constitutional rights under the United States Constitution or the Illinois Constitution or both. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998); 725 ILCS 5/122-1 (West 2018). A defendant may raise a constitutional challenge to both his conviction and his sentence. *People v. Davis*, 2014 IL 115595, ¶ 13. The Act, however, contemplates the filing of a single petition. *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002); 725 ILCS 5/122-1(f) (West 2018).

¶ 22    Successive petitions are highly disfavored, and the statutory bar will be relaxed only when fundamental fairness requires it. *People v. Holman*, 2017 IL 120655, ¶ 25. A successive filing requires leave of court. *People v. Lusby*, 2020 IL 124046, ¶ 27; 725 ILCS 5/122-1(f) (West 2018). For leave to be granted, defendant must make a *prima facie* showing of both "cause" and "prejudice" by submitting sufficient pleadings and documentation to permit the circuit court to make an independent determination on the legal question raised. *People v. Bailey*, 2017 IL 121450, ¶ 24. The "cause and prejudice" test for successive postconviction pleadings is a higher burden than the "frivolous or patently without merit" standard for initial pleadings. *People v. Edwards*, 2012 IL 111711, ¶¶ 24-29.

¶ 23    The cause-and-prejudice test is a procedural prerequisite to obtaining further review of a defendant's claim. *People v. Bland*, 2020 IL App (3d) 170705, ¶ 9. To show cause, a defendant must identify an objective factor that impeded his ability to raise the claim in his initial petition.

*Davis*, 2014 IL 115595, ¶ 14. To show prejudice, a defendant must demonstrate that the claim so infected the trial that the resulting conviction or sentence violated due process. *Id.* As with initial postconviction filings, all well-pleaded facts in the petition and affidavits must be taken as true. *Edwards*, 2012 IL 111711, ¶ 25.

¶ 24    We review the denial of leave to file a successive petition *de novo*. *Bailey*, 2017 IL 121450, ¶ 13. Under the *de novo* standard, a reviewing court performs the same analysis that the trial court would perform, making the question on review whether the trial court's decision was correct as a matter of law. *People v. McDonald*, 2016 IL 118882, ¶ 32. Leave to file a successive petition should only be denied where "it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *People v. Smith*, 2014 IL 115946, ¶ 35. When the requirements for leave to file are met, the successive petition is docketed directly for second-stage proceedings. *People v. Sanders*, 2016 IL 118123, ¶¶ 25, 28.

¶ 25                         B. Defendant's Eighth Amendment Claim

¶ 26    Defendant's eighth amendment argument fails as a matter of law based on *Dorsey*, 2021 IL 123010, where he is unable to establish the prejudice prong of the threshold test for bringing a successive petition. In *Dorsey*, the court considered whether good-conduct credit is relevant in determining whether a defendant received a *de facto* life sentence requiring consideration of the principles enunciated in *Miller*, 567 U.S. 460. *Dorsey*, 2012 IL 123010, ¶ 1. Our supreme court held that "good-conduct credit is relevant and that a sentence imposed pursuant to a statutory

scheme that affords a juvenile an opportunity to be released from prison after serving 40 years or less of the term imposed does not constitute a *de facto* life sentence." *Id.* ¶¶ 1, 50.

¶ 27    In this case, defendant was sentenced before the enactment of the truth-in-sentencing statute, which prohibits defendants convicted of first degree murder from receiving sentence credit and requires them to serve their full sentences. See Pub. Act 90-592 (eff. June 19, 1998) (amending 730 ILCS 5/3-6-3(a)(2)(i)). Under the law in effect at the time of defendant's sentencing, a "prisoner shall receive one day of good conduct credit for each day of service in prison other than where a sentence of 'natural life' has been imposed," and "[e]ach day of good conduct credit shall reduce by one day the inmate's period of incarceration set by the court." 730 ILCS 5/3-6-3(a)(2) (West 1994).

¶ 28    Here, the parties agree that after considering the application of day-for-day sentencing credit, defendant's effective prison term is 37.5 years. Thus, with day-for-day good conduct credit, defendant will be eligible for release in under 40 years. Under *Dorsey*, he has not received a *de facto* life sentence, and *Miller*, 567 U.S. 460, and its progeny do not apply. *People v. Brakes*, 2021 IL App (1st) 181737, ¶¶ 34-38.

¶ 29                    C. Defendant's Proportionate Penalties Claim

¶ 30    The supreme court's supervisory order directed us to "consider the effect of the court's opinion in *People v. Dorsey*, 2021 IL 123010, on the issue of whether defendant's sentence constitutes a *de facto* life sentence and determine if a different result is warranted." After issuing a similar order in *People v. Meneses*, 2022 IL App (1st) 191247-B, ¶ 25, the appellate court reconsidered and again remanded the matter for additional second-stage post-conviction proceedings.

¶ 31    Defendant has filed a motion to cite *Meneses* as additional authority in support of his claim that his sentence, while not a *de facto* life sentence, is nevertheless unconstitutional under the proportionate penalties clause. We ordered the State to file a response to defendant's motion.

¶ 32    In their response, the State maintains that consideration of *Meneses* falls outside the scope of the supreme court's mandate. Further, the State alleges that *Meneses* was wrongly decided on multiple bases.

¶ 33    We have followed the directive of our supreme court and determined that a different result is warranted. This determination, however, leaves a previously undecided, fully briefed issue unresolved. We believe it is appropriate to now consider that remaining claim where we did not reach it in our original opinion.

¶ 34    We begin by noting that a minor who receives a sentence of a term of years may bring an as-applied proportionate penalties challenge to the constitutionality of their sentence. *People v. Gipson*, 2015 IL App (1st) 122451. That being said, we reject defendant's claim that he is entitled to second-stage proceedings to endeavor further to show that his 37½ year sentence violates the proportionate penalties clause.

¶ 35    First, we find that *Meneses* provides no support for defendant's claim where it is procedurally distinguishable. In a nutshell, in *Meneses*, the court only considered defendant's proportionate penalties challenge to his sentence after finding that substantive review was not procedurally barred. *Meneses*, 2022 IL App (1st) 191247-B, ¶ 6. After making this determination, the court found:

> "Under the broader protection provided by our state's own clause, defendant has
> met the low threshold at this stage to allege a colorable claim of disproportionality,

where the trial court believed that deterrence was a 'must' consideration for children. To be effective, deterrence requires a mind capable of forethought. Thus, we reverse and remand for second-stage proceedings where defendant will be required to make a substantial showing that, as applied to him, the sentence he received was constitutionally disproportionate." *Id.* ¶ 22.

¶ 36    The absence of any procedural bars in *Meneses* stands in stark contrast to this case where the State maintained from the outset that defendant failed to satisfy the cause prong for filing a successive petition that did not previously bring this claim. The State only conceded that defendant satisfied the cause prong of the cause-and-prejudice for consideration of his Eighth Amendment claim and not for consideration of this claim. Similarly, our previous finding that defendant satisfied the cause and prejudice test was directed solely to defendant's Eighth Amendment claim and based on our determination that defendant, a minor, received a *de facto* life sentence without consideration of the *Miller* factors.

¶ 37    We find defendant has failed to establish cause to permit review of the merits of this claim where it was not raised in his direct appeal, his initial petition for postconviction relief, or his first successive petition for postconviction relief.

¶ 38    Our determination finds direct support in *Dorsey*, which speaks to more than whether day-for-day good-conduct credit is considered in determining whether a minor has received a *de facto* life sentence. *Dorsey* also speaks to the question of whether a minor sentenced to a term of years without consideration of the *Miller* factors establishes "cause" to allow review of a claim under the proportionate penalties clause:

"Moreover, we find that *Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause. See [*People v.* ]*Patterson*, 2014 IL 115102, ¶ 97 ('A ruling on a specific flavor of constitutional claim may not justify a similar ruling brought pursuant to another constitutional provision.'). As defendant acknowledges, Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing. Thus, *Miller*'s unavailability prior to 2012 at best deprived defendant of 'some helpful support' for his state constitutional law claim, which is insufficient to establish 'cause.' See *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59. And, of course, *Miller*'s unavailability does nothing to explain why in this successive postconviction proceeding defendant neglected to raise the proportionate penalties clause claim below, waiting to raise it instead for the first time before this court." *Dorsey*, 2021 IL 123010, ¶ 74.

¶ 39 *Dorsey* is entirely dispositive of defendant's claim. Defendant has failed to satisfy the cause prong of the cause and prejudice test.

¶ 40 In conclusion, *Dorsey* compels the conclusion that defendant's challenge to the constitutionality of his sentence fails under both the Eighth Amendment and the proportionate penalties provision of the Illinois Constitution.

¶ 41                                    III. CONCLUSION

¶ 42 For the foregoing reasons, we affirm the circuit court's order denying defendant leave to file a successive postconviction petition.

¶ 43     Affirmed.

¶ 44     PRESIDING JUSTICE GORDON, specially concurring:

¶ 45     I concur in the judgment. However, I must write separately regarding the *Meneses* opinion that I authored. *Meneses* is inapplicable to the case at bar simply because proportionality was raised in *Meneses* and not raised here.

¶ 46     In *Meneses*, the defendant claimed in his successive postconviction petition that his sentence violated the proportionate penalties clause of our state's constitution. His petition repeatedly cited and quoted the clause and argued that his sentence was disproportionate. Specifically, he argued that, although his sentence was within the applicable statutory range, it was manifestly disproportionate to the crime that he had committed, in light of the sentencing factors for juveniles that were not in existence at the time that he was sentenced.

¶ 47     By contrast, in the case at bar, defendant's successive postconviction petition does not argue that his sentence was disproportionate. He argues instead that "Illinois law should be changed to provide a judge the opportunity to examine a defendant's life after he has had an opportunity to grow up, mature, and prove himself" while in prison. Defendant argues that he "has not sat idle during his incarceration." In essence, defendant is arguing for a parole hearing where he can present evidence of his accomplishments subsequent to sentencing.

¶ 48     As our supreme court similarly observed in *Dorsey*, defendant offers "nothing to explain why" he "wait[ed] to raise" the proportionate penalties clause "for the first time before this court." *Dorsey*, 2021 IL 123010, ¶ 74. It is for this reason that *Meneses* is not applicable.

---

**No. 1-17-2390**

---

| | |
|---|---|
| **Cite as:** | *People v. Figueroa*, 2022 IL App (1st) 172390-B |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 92-CR-27511; the Hon. Michael B. McHale, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and David T. Harris, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, David H. Iskowich, and Jessica L. Wasserman, Assistant State's Attorneys, of counsel), for the People. |